UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MICHAEL JERMAIL CRIMES,

        Petitioner,

                           CASE NO. 2:09-CV-10402

  v.                       JUDGE MARIANNE O. BATTANI

                           MAGISTRATE JUDGE PAUL J. KOMIVES

CATHERINE S. BAUMAN,

        Respondent.[1]

_____/


## REPORT AND RECOMMENDATION

*Table of Contents*

| | | |
|---|---|---|
| I. | RECOMMENDATION | 2 |
| II. | REPORT | 2 |
| | A.   *Procedural History* | 2 |
| | B.   *Factual Background Underlying Petitioner's Conviction* | 4 |
| | C.   *Procedural Default* | 8 |
| | D.   *Standard of Review* | 8 |
| | E.   *Sentencing Claims (Claims II & III)* | 10 |
| |     1.   *Guidelines Scoring* | 11 |
| |     2.   *Right to Jury Trial* | 11 |
| | F.   *Jury Instructions (Claim VI)* | 15 |
| |     1.   *Clearly Established Law* | 15 |
| |     2.   *Analysis* | 16 |
| | G.   *Ineffective Assistance of Counsel (Claims I, IV, V & VII)* | 20 |
| |     1.   *Clearly Established Law* | 20 |
| |     2.   *Trial Counsel* | 22 |
| |         a. Failure to Present Witnesses (Claim I) | 22 |
| |         b. Failure to Object to Sufficiency of the Evidence (Claim IV) | 26 |
| |         c. Conflict of Interest (Claim V) | 28 |
| |     3.   *Appellate Counsel (Claim VII)* | 31 |
| | H.   *Recommendation Regarding Certificate of Appealability* | 31 |
| |     1.   *Legal Standard* | 31 |
| |     2.   *Analysis* | 33 |
| | I.   *Conclusion* | 34 |
| III. | NOTICE TO PARTIES REGARDING OBJECTIONS | 34 |

---

[1]By Order entered this date, Catherine S. Bauman has been substituted in place of Cindi Curtin as the proper respondent in this action.

I.      RECOMMENDATION: The Court should deny petitioner's application for the writ of

habeas corpus and should deny petitioner a certificate of appealability.

II.     REPORT:

A.      *Procedural History*

        1.      Petitioner Michael Jermail Crimes is a state prisoner, currently confined at the Alger

Maximum Correctional Facility in Munising, Michigan.

        2.      On February 10, 2006, petitioner was convicted of one count of armed robbery,

MICH. COMP. LAWS § 750.529; and one count of first degree home invasion, MICH. COMP. LAWS

§ 750.110a, following a jury trial in the Oakland County Circuit Court.  On March 23, 2006, he was

sentenced to a term of 16-40 years' imprisonment on the armed robbery conviction, and to a

concurrent term of 7-20 years' imprisonment on the home invasion conviction.

        3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through

counsel, the following claims:

        I.      TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE WHERE
                HE FAILED TO PRESENT MR. CRIMES' WITNESSES THEREBY
                FAILING TO PRESENT A DEFENSE.  MR. CRIMES IS ENTITLED TO
                A NEW TRIAL.  ALTERNATIVELY, MR. CRIMES IS ENTITLED TO A
                *GINTHER* HEARING IN ORDER TO DEVELOP THE ISSUE.

        II.     OFFENSE VARIABLES 8 AND 13 WERE WRONGLY SCORED.  THE
                GUIDELINE RANGE WAS IMPROPERLY INFLATED.  MR. CRIMES
                IS ENTITLED TO A RESENTENCING WITHIN THE PROPERLY
                SCORED GUIDELINES.

Petitioner filed a *pro per* supplemental brief, raising the following additional claim:

        III.    THE TRIAL COURT VIOLATED MR. CRIMES' FEDERAL AND STATE
                CONSTITUTIONAL RIGHTS AT SENTENCING BY SCORING OV-1 &
                2 OF THE STATUTORY SENTENCING GUIDELINES BASED ON A
                MISAPPREHENSION AND IN RELIANCE ON INACCURATE
                INFORMATION, WHICH WAS NOT PRESENTED TO THE JURY OR

ADMITTED BY THE DEFENDANT.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence. *See People v. Crimes*, No. 270212, 2007 WL 4462377 (Mich. Ct. App. Dec. 20, 2007) (per curiam).

4.      Petitioner, proceeding *pro se*, sought leave to appeal these issues to the Michigan Supreme Court.  The Supreme Court denied petitioner's application for leave to appeal in a standard order.  *See People v. Crimes*, 480 Mich. 1189, 747 N.W.2d 290 (2008).

5.      On February 2, 2009, petitioner filed an application for the writ of habeas corpus in this Court, raising the three claims that he raised in the state courts.  On March 11, 2009, petitioner filed a motion to hold his petition in abeyance, so that he could exhaust additional claims in state court.  The Court granted the motion on March 31, 2009.

6.      Petitioner returned to state court, filing a motion for relief from judgment in the trial court pursuant to MICH. CT. R. 6.500-.508 on June 12, 2009.  Petitioner's motion raised the following claims:

I.      DEFENSE COUNSEL'S FAILURE TO OBJECT TO THE INSUFFICIENCY OF THE EVIDENCE FOR ARMED ROBBERY AND AIDING AND ABETTOR DEPRIVED DEFENDANT OF HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL.

II.     DEFENDANT IS ENTITLED TO A NEW TRIAL WHERE THE RECORD SHOWS THAT HIS ATTORNEY HAD A CONFLICT OF INTEREST CREATING A STRUCTURAL DEFECT IN THE TRIAL PROCESS WHICH DENIED DEFENDANT HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.

III.    THE COURT ERRED AND DEPRIVED DEFENDANT OF HIS RIGHT TO DUE PROCESS WHEN THE JURY INSTRUCTION ON AIDING AND ABETTING WAS INCORPORATED INTO THE ARMED ROBBERY INSTRUCTION WHEN THE PROSECUTION HAD NOT ADVANCED THE THEORY THAT DEFENDANT WAS AN AIDER AND ABETTOR, WHEN THE EVIDENCE DID NOT SUPPORT THE

THEORY.

IV.   APPELLATE COUNSEL'S CONSTITUTIONALLY INEFFECTIVE ASSISTANCE ESTABLISHES "GOOD CAUSE" FOR DEFENDANT'S FAILURE TO PROPERLY RAISE THESE ISSUES IN HIS PRIOR APPEAL.

On September 16, 2009, the trial court denied petitioner's motion for relief from judgment, concluding that petitioner failed to establish good cause or actual prejudice as necessary to permit review of his claims pursuant to MICH. CT. R. 6.508(D)(3). The Michigan Court of Appeals denied petitioner's application for a leave to appeal in a standard order, "for lack of merit in the grounds presented." *People v. Crimes*, No. 294526 (Mich. Ct. App. Dec. 3, 2009). The Michigan Supreme Court denied petitioner's application for leave to appeal in a standard order, based on petitioner's "fail[ure] to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Crimes*, 487 Mich. 852, 785 N.W.2d 145 (2010).[2]

7.   Petitioner filed a motion to amend and to reopen the case, which the Court granted on October 5, 2010. As grounds for the writ of habeas corpus, petitioner raises the three claims he raised on direct appeal and the four claims he raised in his motion for relief from judgment.

8.   Respondent filed his answer on April 4, 2011. He contends that petitioner's fourth through seventh claims are barred by petitioner's procedural default in the state courts, and that all of his claims are without merit.

B.   *Factual Background Underlying Petitioner's Conviction*

Petitioner's convictions arise from the July 6, 2005, robbery of Kathryn Ataman in her apartment. Petitioner was tried in a joint trial before separate juries with his codefendant Johnaquin

---

[2]It does not appear that petitioner raised his second motion for relief from judgment claim, alleging a conflict of interest, in either application for leave to appeal.

Keyes.  The evidence adduced at trial was accurately summarized in the prosecutor's brief in

response to petitioner's motion for relief from judgment, as reproduced in respondent's answer:

>     Defendant was charged with armed robbery, MCL 750.529, and first degree home invasion, MCL 750.110a(2), for events occurring on July 6, 2005. It was alleged that Defendant and co-defendant Johnaquin Keyes forcibly entered Kathryn Julia Ataman's apartment by kicking open the door, that Ataman and her two children were present at the time, that Defendant and co-defendant demanded money from Ataman at gunpoint, and that Ataman, being in fear, gave over some money. (T Vol II 86-95)
>
>     At the time of arraignment, Defendant was represented by attorney Michael Steinberg. (T 9-8-2005 3) There was some discussion, however, that Defendant had met with and was considering obtaining a new attorney, Richard Taylor. (T 9-8-2005 3-4) Mr. Steinberg continued to represent Defendant until a hearing was held on January 23, 2006, before this Court, concerning Mr. Steinberg's contact at the county jail with a witness, Jermaine Orlando Jackson. (T 1-23-2006 3-5) Mr. Steinberg allegedly called Jackson a "snitch" in front of other people at the jail. (T 1-23-2006 11, 13) Apparently an investigation concerning this incident was conducted and "isn't going any further." However, Mr. Steinberg's privileges to visit anybody in the jail including his client were revoked. (T 1-23-2006 4) And, there was concern that Mr. Steinberg may have created a conflict in this case and may be a witness to contradict Jackson's testimony and challenge his credibility. (T 1-23-2006 16-36, 76, 78-79) Ultimately, Mr. Steinberg moved to withdraw as counsel. (T 1-23-2006 76) Defendant agreed and indicated that he was already seeking another attorney. (T 1-23-2006 77) This Court granted the motion. (T 1-23-2006 77-78) The Court indicated it had conferred with attorney Richard Taylor and appointed him as the successor attorney for Defendant. The Court adjourned the matter to February 6, 2006, for trial. (T 1-23-2006 79)
>
>     Defendant's jury trial was held in February 2006, with this Honorable Court presiding. The defense maintained that the case was about credibility and that Defendant was not one of the perpetrators in Ataman's apartment. The defense did not deny that what happened to Ataman was true. However, the defense pointed to several seeming inconsistencies and argued that Defendant's name came up as one of the intruders only after Ataman talked to her boyfriend. The defense also challenged the credibility of inmate Jermaine Jackson, who the defense characterized as a "professional witness." (T Vol II 95-102; T Vol V 62-81) The prosecution maintained that Ataman recognized Defendant as one of the intruders because he had been to her apartment before and maintained that she did not initially tell the police Defendant's identity because she was afraid for the very reasons that Defendant knew her, knew where she lived and knew she had children. The prosecution also stressed that Jermaine Jackson, the person to whom Defendant told several unknown and corroborated facts about the intrusion and robbery, was already convicted and sentenced in his own case and was promised nothing for his testimony. (T Vol I 86-

95; T Vol V 49-62, 81-88)

 Kathryn Ataman testified that on July 6, 2005, she and her boyfriend Kurt Pryor lived with her daughters, Makenzi, 4½ years old, and Kaley, 1½ years old, in an apartment in Waterford Township. At approximately 7:00 p.m. on that date, only Ms. Ataman and her daughters were in the apartment. (T Vol III 9-12) The Defendant and another man kicked in the door to the apartment and entered the apartment. Ms. Ataman recognized Defendant Crimes because he had been in the apartment on two or three prior occasions as an acquaintance of Ataman's boyfriend. Ms. Ataman identified the other man as being the co-defendant Johnaquin Keyes. Keyes had a gun and told Ataman to shut up. (T Vol III 13-17) The men took Ataman away from the outside door of the apartment to a back bedroom in the apartment. (T Vol III 17) The Defendant was flipping things around and looking in the closet. The Defendant said to Keyes that Ataman knew where things were and told the other man to tie Ataman up. (T Vol III 17) Keyes then told Ataman to get on the ground. (T Vol III 17-18) Keyes put the gun to Ataman's head and told her to give them everything. Ataman gave $26 from her pocket to Keyes. (T Vol III 18) Keyes left, but the Defendant stayed in the apartment and flipped over Ataman's mattress and computer desk. The Defendant then went into the bedroom of Ataman's daughter. (T Vol III 19-20) The Defendant did not find anything in the daughter's bedroom, came out, flipped over a couple of couches and pillows and ran out of the apartment. (T Vol III 20) The Defendant and Keyes broke into the apartment about an hour after boyfriend Kurt Pryor left the apartment. (T Vol III 23)

 Ms. Ataman testified further that she called Kurt Pryor and told him that she had been robbed and then called the police at 911. Pryor arrived back at the apartment and then Officer Morgan and another officer arrived. (T Vol III 23- 24) Before the police arrived, Ataman told Pryor that Defendant Crimes was one of the robbers. Ataman did not tell Officer Morgan that she recognized one of the robbers because she was afraid if she did so, the robbers might come back. (T Vol III 25-26) Ataman left the apartment that night and never moved back in. Ataman called Officer Morgan later that night and left a message for him that Defendant Crimes was one of the robbers. (T Vol III 25-27) Subsequently, Ataman went into the Waterford Police Department and told an officer that Defendant Crimes was one of the men who broke into her apartment. (T Vol III 28-29) Ataman identified co-defendant Keyes as the man who broke into her apartment with the gun in a photographic array and in a corporeal lineup. (T Vol III 31-35)

 Kurt Pryor testified that Kathryn Ataman was his girlfriend and they lived in the Glengarry Apartment Complex with Ataman's daughters Makenzi and Kaley. Pryor was Kaley's father. On July 6, 2005, Pryor was working in his own business doing brick cleaning and caulking. (T Vol III 79-80) On that date, Pryor had $4,000 with him because he was going to purchase a car. (T Vol III 80-81) The day before, Pryor's first cousin Devon Dawson had seen Pryor counting the money in Pryor's apartment. (T Vol III 82-83) On that same day, Antonio Jordan, the boyfriend of Pryor's cousin, asked Pryor how much money he had saved up. Antonio Jordan's street name was Tone. (T Vol III 83-84) On July 6, 2005, Pryor was on his way back

from purchasing a car in Detroit. Pryor got a call from Ataman who said that she had been robbed. (T Vol III 86) Pryor got to the apartment just before the police arrived and Ataman told him that Defendant Crimes was one of the robbers. Pryor knew that Devon Dawson and Antonio Jordan were friends of the Defendant. (T Vol III 88) Pryor did not tell the police that the Defendant was one of the robbers because Pryor intended to confront the Defendant on his own. (T Vol III 89-90) Pryor went with Ataman the next day to the Waterford Police Department. (T Vol III 95)

Sergeant Steve Ryner of the Waterford Police Department testified that at some time after 9:00 p.m. on July 7, 2005, Kurt Pryor and Kathryn Ataman came into the Waterford Police Department and said that they had new information concerning the home invasion of their apartment. Sgt. Ryner interviewed Ataman separately from Pryor and she told him that Defendant Crimes was one of the two people who robbed her. Ataman said that she did not initially tell the police that she recognized the Defendant because she feared retribution if she identified someone. (T Vol IV 88-92) Ataman had earlier left a telephone voice mail for Officer Morgan with that information. (T Vol III 93) Ataman indicated further that she had moved out of the apartment and was living with her mother. (T Vol IV 94)

Jermaine Jackson testified that he was in a ten-man cell with the Defendant Michael Crimes in the Oakland County Jail. (T Vol IV 113) The Defendant talked about his case with Jackson. (T Vol IV 114). The Defendant said there was supposed to be a sum of money in the apartment because Ataman's boyfriend was a drug dealer. A man named Devon or "Tone" had told the Defendant about the money in the apartment. (T Vol IV 119-120) The Defendant knew where the apartment was because he had been in it with the boyfriend. (T Vol IV 121) The Defendant told Jackson that he and his friend Mook went into the apartment and demanded money from the woman. Mook had a gun. (T Vol IV 117) Jackson had not been promised anything for testifying in this case. (T Vol IV 125)

Officer Michael Morgan of the Waterford Police Department testified that on July 6, 2005, he was dispatched to the apartment of Ataman and observed that the door into the apartment was damaged. Ataman was very upset, but eventually calmed down and described the robbers. (T Vol IV 168-172) Kurt Pryor arrived at the apartment about the same time as Officer Morgan. (T Vol IV 170) Ataman did not initially say that she recognized one of the robbers, but subsequently left him a voice mail that she recognized one of the robbers as being the Defendant Michael Crimes. (T Vol IV 177-178)

Detective Paul Osika of the Waterford Police Department testified that he was the officer in charge of this case. (T Vol IV 198) Det. Osika interviewed Jermaine Jackson at the Oakland County Jail on October 3, 2005, and got the name Mook as a suspect. (T Vol IV 202) Det. Osika was advised by a Pontiac police officer that Mook was a street name for Johnaquin Keyes. He obtained a photograph of Johnaquin Keyes and included it in a photo array shown to Ms. Ataman. (T Vol IV 204-205) Ataman picked out Johnaquin Keyes in the photo array. (T Vol IV 210)

[Defense counsel indicated that he and the Defendant discussed calling Mr. Jermaine Crimes and Ms. Veronica Crimes as witnesses and that the Defendant

7

decided that those individuals should not be called as defense witnesses. (T Vol V
5, 47) The Defendant then rested. (T Vol V 48)]

On February 10, 2006, the jury found the Defendant guilty as charged of
armed robbery and first degree home invasion. (T Vol VI 5-6)

Answer, at 1-5 (quoting People's Br. in Opp'n to Mot. for Relief from Judgment, at 1-6).

C.      *Procedural Default*

Respondent first contends that petitioner's claims are barred by petitioner's procedural

default in the state courts, because petitioner failed to raise these claims on direct appeal. Although

petitioner's claims are defaulted, the Court should conclude that it is necessary to address the claims

on the merits. Even if defaulted, petitioner can still have his claims reviewed on the merits if he can

show cause for, and prejudice attributable to, his default in the state courts. Petitioner contends that

his appellate counsel was ineffective for failing to raise these claims on direct appeal. If petitioner's

position is correct, counsel's ineffectiveness may constitute cause to excuse any procedural default.

*See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

To demonstrate that appellate counsel was ineffective petitioner must show, *inter alia*, that his

claims would have succeeded on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000);

*McCleese v. United States*, 75 F.3d 1174, 1180 (7th Cir. 1996). Given that the cause and prejudice

inquiry merges with an analysis of the merits of petitioner's defaulted claims, it is better to simply

consider the merits of these claims, even if they are defaulted. *See Jamison v. Collins*, 100 F. Supp.

2d 647, 676 (S.D. Ohio 2000); *Watkins v. Miller*, 92 F. Supp. 2d 824, 832 (S.D. Ind. 2000); *cf.*

*Strickler v. Greene*, 527 U.S. 263, 282 (1999) (considering merits of petitioner's habeas claims

where inquiry into the merits mirrored cause and prejudice inquiry).

D.      *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by

the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No.

104-132, 110 Stat. 1214 (Apr. 24, 1996).  *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).

Amongst other amendments, the AEDPA amended the substantive standards for granting habeas

relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning."

*Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002).  "A

state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts

the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are

materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a

result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam)

(quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535

U.S. at 694.  "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court

to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme]

Court but unreasonably applies that principle to the facts' of petitioner's case."  *Wiggins v. Smith*,

539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694.

However, "[i]n order for a federal court to find a state court's application of [Supreme Court]

precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous.  The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court."  Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence."  *Williams*, 529 U.S. at 412.  Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.'  In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16.  Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue.  *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

E.    *Sentencing Claims (Claims II & III)*

Petitioner first raises two claims challenging his sentence.  In Claim II, petitioner contends that the sentencing guidelines were improperly scored.  In Claim III, he contends that he was denied his right to a jury trial by the trial court's scoring of various offense variables.  The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.    *Guidelines Scoring*

With respect to the scoring of the guidelines, petitioner's claim is not cognizable on habeas review.  A habeas petitioner's claim that the trial court violated state law when sentencing him is not cognizable in habeas corpus proceedings. *See Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988); *Haynes v. Butler*, 825 F.2d 921, 924 (5th Cir. 1987).  Federal habeas courts have no authority to interfere with perceived errors in state law unless the petitioner is denied fundamental fairness in the trial process. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Serra v. Michigan Department of Corrections*, 4 F.3d 1348, 1354 (6th Cir. 1993).  Petitioner's claim that the court improperly scored or departed from the guidelines range raises issues of state law that are not cognizable on habeas review. *See Cook v. Stegall*, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999) (Gadola, J.) (claim that sentencing court departed from Michigan sentencing guidelines presents an issue of state law only and is, thus, not cognizable in federal habeas review); *Welch v. Burke*, 49 F. Supp. 2d 992, 1009 (E.D. Mich. 1999) (Cleland, J.) (same); *see also, Branan*, 851 F.2d at 1508 (claim that court misapplied state sentencing guidelines not cognizable on habeas review).  Thus, petitioner is not entitled to habeas relief on his claims relating to the trial court's scoring of, or departure from, the Michigan sentencing guidelines.

2.    *Right to Jury Trial*

11

Petitioner next contends that the trial court based its sentence on facts which were not proved by the prosecution beyond a reasonable doubt, in violation of the Supreme Court's decisions in *Blakely v. Washington*, 542 U.S. 296 (2004) and *Apprendi v. New Jersey*, 530 U.S. 466 (2000). In *Apprendi*, the Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. In *Blakely*, the Court considered the applicability of *Apprendi* to a state sentencing guidelines scheme similar to the United States Sentencing Guidelines. The state in that case argued that guidelines findings were not prohibited by *Apprendi* because *Apprendi* prohibited only factual findings at sentencing which increased the statutory maximum penalty to which the defendant was exposed. The Court in *Blakely* rejected this argument and struck down the state guidelines scheme, explaining that:

> the "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.* In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," and the judge exceeds his proper authority.

*Blakely*, 542 U.S. at 303-04 (citations omitted) (emphasis in original). Finally, in *United States v. Booker*, 543 U.S. 220 (2005), the Court took the step logically suggested by *Blakely*, concluding that the United States Sentencing Guidelines are unconstitutional under *Apprendi* because they allow federal judges to impose sentences based on facts not found by a jury beyond a reasonable doubt. *See Booker*, 543 U.S. at 233, 237-43.

*Blakely* and *Apprendi*, however, are inapplicable here. Michigan law provides for an indeterminate sentencing scheme, unlike the determinate sentencing schemes at issue in *Blakely* and

12

*Booker*.  Under Michigan law the defendant is given a sentence with a minimum and a maximum sentence.  The maximum sentence is not determined by the trial judge but is set by law.  *See People v. Drohan,* 475 Mich. 140, 160-61, 715 N.W.2d 778, 789-90 (2006); *People v. Claypool,* 470 Mich. 715, 730 n.14, 684 N.W.2d 278, 286 n.14 (2004); MICH. COMP. LAWS § 769.8.  "[M]ichigan's sentencing guidelines, unlike the Washington guidelines at issue in *Blakely*, create a range within which the trial court must set the minimum sentence." *Drohan,* 475 Mich. at 161, 715 N.W.2d at 790.  Under Michigan law, only the minimum sentence must presumptively be set within the appropriate sentencing guidelines range. *See People v. Babcock,* 469 Mich. 247, 255 n.7, 666 N.W.2d 231, 236 n.7 (2003) (discussing MICH. COMP. LAWS § 769.34(2)).  Under Michigan law, the trial judge sets the minimum sentence, but can never exceed the maximum sentence. *See Claypool,* 470 Mich. at 730 n.14, 684 N.W.2d at 286 n.14.

*Blakely* is inapplicable here because *Blakely* is concerned only with the *maximum* penalty which is authorized by a jury's findings or a defendant's plea: if some additional factor increases the defendant's penalty beyond that which could be imposed solely on the basis of the jury's findings or the defendant's plea, *Blakely* requires that those facts be found by a jury beyond a reasonable doubt (or be themselves pleaded to by a defendant).  As explained above, unlike the guidelines scheme at issue in *Blakely*, the Michigan sentence guidelines help determine only the minimum portion of a defendant's indeterminate sentence.  The maximum is, in every case, the statutory maximum authorized by law.  *See Claypool*, 470 Mich. at 730 n.14, 684 N.W.2d at 286 n.14; MICH. COMP. LAWS § 769.8. Petitioner's conviction on the armed robbery charge, therefore, contained all of the factual findings necessary to impose the statutory maximum (life imprisonment) on that charge.  *See Drohan*, 475 Mich. at 162, 715 N.W.2d at 790 ("Thus, the trial court's power

13

to impose a sentence is always derived from the jury's verdict, because the 'maximum-minimum'

sentence will always fall within the range authorized by the jury's verdict.").

     This being the case, petitioner's sentence did not violate *Blakely*. The Supreme Court has

repeatedly made clear that the *Apprendi* rule is concerned only with the maximum sentence which

is authorized by a jury's verdict or a defendant's plea. As the Supreme Court explained in *Harris*

*v. United States*, 536 U.S. 545 (2002):

> *Apprendi* said that any fact extending the defendant's sentence beyond the maximum
> authorized by the jury's verdict would have been considered an element of an
> aggravated crime–and thus the domain of the jury–by those who framed the Bill of
> Rights. The same cannot be said of a fact increasing the mandatory minimum (but
> not extending the sentence beyond the statutory maximum), for the jury's verdict
> authorized the judge to impose the minimum with or without the finding.

*Harris*, 536 U.S. at 557. This distinction is important because the only issue under the Sixth

Amendment is whether the judge is impinging on the role of the jury. For this reason, the Court

explicitly excepted indeterminate sentencing schemes such as Michigan's from its holding in

*Blakely*. Rejecting an argument raised by Justice O'Connor in dissent, the Court explained:

>     Justice O'Connor argues that, because determinate sentencing schemes
> involving judicial factfinding entail less judicial discretion than indeterminate
> schemes, the constitutionality of the latter implies the constitutionality of the former.
> This argument is flawed on a number of levels. First, the Sixth Amendment by its
> terms is not a limitation on judicial power, but a reservation of jury power. It limits
> judicial power only to the extent that the claimed judicial power infringes on the
> province of the jury. Indeterminate sentencing does not do so. It increases judicial
> discretion, to be sure, but not at the expense of the jury's traditional function of
> finding the facts essential to lawful imposition of the penalty. Of course
> indeterminate schemes involve judicial factfinding, in that a judge (like a parole
> board) may implicitly rule on those facts he deems important to the exercise of his
> sentencing discretion. But the facts do not pertain to whether the defendant has a
> legal *right* to a lesser sentence–and that makes all the difference insofar as judicial
> impingement upon the traditional role of the jury is concerned.

*Blakely*, 542 U.S. at 309 (citation omitted).

Under this reasoning, it is clear that Michigan's indeterminate sentencing guideline scheme, under which the maximum is established by statute and only the minimum term is based on judicial factfinding, does not violate the Sixth Amendment, as both the Sixth Circuit and the Michigan Supreme Court have repeatedly held. *See Montes v. Trombley*, 599 F.3d 490, 496-97 (6th Cir. 2010); *Chontos v. Berghuis*, 585 F.3d 1000, 1002 (6th Cir. 2009); *Drohan,* 475 Mich. at 164, 715 N.W.2d at 791-92; *Claypool*, 470 Mich. at 730 n.14, 684 N.W.2d at 286 n.14.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.    *Jury Instructions (Claim VI)*

Petitioner next claims that he was denied a fair trial by the inclusion of an aiding and abetting instruction which was not supported by the evidence at trial.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.    *Clearly Established Law*

It is well established that habeas corpus is not available to remedy a state court's error in the application of state law.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Jackson v. Ylst*, 921 F.2d 882, 885 (9th Cir. 1990) (a federal court on habeas review "ha[s] no authority to review a state's application of its own laws).  Thus, in order for habeas corpus relief to be warranted on the basis of incorrect jury instructions, a petitioner must show more than that the instructions are undesirable, erroneous or universally condemned; rather, taken as a whole, they must be so infirm that they rendered the entire trial fundamentally unfair.  *See Estelle*, 502 U.S. at 72 (1991); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Wood v. Marshall*, 790 F.2d 548, 551-52 (6th Cir. 1986); *cf. United States v. Sheffey*, 57

15

F.3d 1419, 1429-30 (6th Cir. 1995) (standard of review for jury instructions challenged on direct criminal appeal). As the Supreme Court noted in *Estelle*, the Court should "also bear in mind [the Supreme Court's] previous admonition that we 'have defined the category of infractions that violate "fundamental fairness" very narrowly.'" *Estelle*, 502 U.S. at 72-73 (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)).

    2.    *Analysis*

MICH. COMP. LAWS § 767.39  abolished the common law distinction between aiders and abettors and principals, and provides that aiders and abettors may be prosecuted and convicted as though they had directly participated in the crime. *See People v. Palmer*, 392 Mich. 370, 378, 220 N.W.2d 393, 396 (1974). Aiding and abetting under Michigan law requires proof of three elements: (1) commission of the underlying crime either by the defendant or some other person; (2) acts or encouragement by the defendant which aided or assisted the commission of the crime; and (3) intent on the part of the defendant to commit the crime or knowledge by the defendant that the principal intended to commit the crime at the time aid or encouragement was given. *See People v. Acosta*, 153 Mich. App. 504, 511-12, 396 N.W.2d 463, 467 (1986) (per curiam). Here, the trial court instructed the jury on these three elements, explaining that to convict petitioner as an aider and abettor, it must find beyond a reasonable doubt:

> First, that the alleged crime was actually committed, either by the defendant or someone else. It does not matter whether anyone else has been convicted of the crime. Second, that before or during the crime, the defendant did something to assist in the commission of the crime. Third, the defendant must have intended the commission of the crime alleged or must have known that the other person intended its commission at the time of giving the assistance.

Trial Tr., Vol. V, at 96-97. This instruction was consistent with Michigan aiding and abetting law as set forth above, and tracks MICHIGAN CRIMINAL JURY INSTRUCTION 2D 8.1. Judges of this Court

16

have repeatedly held that these instructions adequately inform the jury of all the elements of aiding and abetting liability, including the intent element. *See Polk v. Trombley*, No. 2:06-CV-10568, 2007 WL 2746614, at *4 (E.D. Mich. Sept. 19, 2007) (Zatkoff, J.); *Shepherd v. Howes*, No. 05-CV-71936, 2007 WL 551601, at *7 (E.D. Mich. Feb. 20, 2007) (Cleland, J.); *Pannell v. McKee*, No. 05-71439, 2006 WL 1662805, at *9 (E.D. Mich. June 9, 2006) (Edmunds, J., adopting report of Komives, M.J.).

The trial court's initial instructions to the jury tied the aiding and abetting instruction only to the armed robbery charge. The jury sent a note to the court asking whether aiding and abetting also applied to the home invasion charge. After hearing the arguments of the parties, the court concluded that the instruction did apply to the home invasion charge and so instructed the jury. *See* Trial Tr., Vol. V, at 109-12. As noted above, an improper jury instruction warrants habeas relief only when the instructions are so deficient that they render the entire trial fundamentally unfair. *See Estelle*, 502 U.S. at 72; *Henderson*, 431 U.S. at 154. Here, petitioner cannot show that applying the aiding and abetting instruction to the home invasion charge deprived him of a fair trial. The prosecution's theory from the outset was, and the evidence at trial showed, that two perpetrators committed the home invasion and robbery together. This evidence was sufficient to warrant an aiding and abetting instruction, and thus petitioner was not denied a fair trial by the trial court's giving of such an instruction to the jury.

Petitioner's brief also suggests that the trial court erred in giving a deadlocked jury instruction to the jury. At around the same time as the jury requested clarification on the aiding and abetting issue, the jury also sent a note informing the court that it was deadlocked. In response to that note, the trial judge instructed:

17

Now you sent me a note a little bit later where you said we have conducted our deliberations according to the guidelines given and are still deadlocked. I know that reaching agreement is often a difficult effort to accomplish. It's important for all of you to listen to each other's opinions. It's important for each of you when you express your opinion to not simply express an opinion, but to give reasons for your opinion. That's really the way your fellow jurors can evaluate fully what each of you believes. So it's important for you to listen, go over the reasons for why you feel a certain way about something and then for you to hear from your fellow jurors their opinion and their reasons.

Often times when you fully discuss each other's opinions, you are able to reason this out together and you will be able to come to a decision that reflects a unanimous view. It's only natural that there will be differences of opinion from time to time, but I think when you talk things over in the spirit of fairness and frankness and when you explain yourselves fully, you have an excellent chance of coming to a unanimous decision. I don't want anyone to give up his or her honest belief about the weight or affect of the evidence only because other jurors think differently or only for the sake of reaching agreement. Nobody should surrender their honest belief about this case. At the same time I don't think anyone should hesitate to change his or her views, to change his or her opinion if you decide that that view is wrong based on what you're hearing from your fellow jurors. After all, that's why we do have a jury of 12 people so that all of you can consider each other's views and hopefully come to a unanimous decision.

I am going to at this point because of the lateness of the hour send you home for the day. I want everybody to have a good dinner, a good night's sleep and I want you to come back tomorrow morning at 8:30. It's very important that we make every reasonable effort, every reasonable effort to try to come to a unanimous decision, so that is what I'm going to ask you to please do and I want to thank you all for working so hard, I know you have been working hard, I've got that 'cause you're sending us out some good questions that means you are thinking very, very hard about this case and we all appreciate that. I know you have been attentive throughout the trial, so thank you very, very much for your good work and I look forward to seeing you again tomorrow at 8:30.

Trial Tr., Vol. V, at 113-15.

Petitioner cannot show that he was deprived of a fair trial by this instruction. It is well established that "[a] judge may encourage jurors who are having difficulty reaching a verdict to deliberate longer[.]" *United States v. Straach*, 987 F.2d 232, 242 (5th Cir. 1993) (citing *Allen v. United States*, 164 U.S. 492 (1896)). Such an instruction is improper only if it "unduly coerces the minority into surrendering its views for the purpose of reaching a verdict, or sets a time limit for the

deliberations." *Id.* (internal quotation omitted).  Here, the trial judge simply instructed the jury to continue deliberations.  He did not indicate that the jury should reach a particular result, or that any juror should sacrifice his or her own views; in fact, he instructed just the opposite.  The courts have uniformly held that this type of neutral instruction is not coercive.  As the Eleventh Circuit has explained: "The judge's simple request that the jury continue to deliberate . . . was routine and neutral.  Nothing in the brief instruction suggested that a particular outcome was either desired or required and it was not 'inherently coercive.'" *United States v. Prosperi*, 201 F.3d 1335, 1341 (11th Cir. 2000).  Likewise, the Seventh Circuit has explained that "an instruction to continue to deliberate after the jury had declared that it had reached an impasse is perfectly content neutral and carries no plausible potential for coercing the jury to surrender their honest opinions for the mere purpose of returning a verdict." *United States v. Kramer*, 955 F.2d 479, 489 (7th Cir. 1992) (internal quotations omitted); *accord United States v. Frazin*, 780 F.2d 1461, 1470-71 (9th Cir. 1986).

In short, the instruction lacked any of the traditional indicia of a coercive instruction: the court did not mention the expense of a retrial; the court did not suggest that any juror abandon his or her sincerely held views; the court did not instruct or suggest that the jury had to reach a particular verdict, or indeed any verdict at all, but only that the jury should try to reach a verdict, if possible; and the instruction was not given in an atmosphere of frustration over the deadlock.  Thus, the instruction was not coercive.  *See United States v. Nelson*, 137 F.3d 1094, 1109-10 (9th Cir. 1998).  Further, the jury deliberated for about three hours after the instruction was given and following an overnight respite–about one hour longer than it had deliberated prior to advising the court that it was deadlocked–which suggests that the instruction prompted continued deliberation, rather than coercing any juror into merely surrendering his or her views.  *See United States v.*

19

*Whatley*, 133 F.3d 601, 605 (8th Cir. 1998); *United States v. Rodriguez-Mejia*, 20 F.3d 1090, 1092 (10th Cir. 1994). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

G.    *Ineffective Assistance of Counsel (Claims I, IV, V & VII)*

Petitioner next contends that he received constitutional inadequate assistance of counsel in a number of respects. In Claim I, petitioner argues that counsel was ineffective for failing to present witnesses. In Claim IV, he argues that counsel was ineffective for failing to challenge the sufficiency of the evidence. In Claim V, petitioner contends that trial counsel was laboring under a conflict of interest. Finally, in Claim VII, petitioner argues that his appellate counsel was ineffective for failing to raise his fourth through sixth habeas claims on direct appeal. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.    *Clearly Established Law*

The Sixth Amendment right to counsel and the right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id*. at 687. These two components are mixed questions of law and fact. *Id*. at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.* With respect to the performance prong of the *Strickland* test, a strong presumption

exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id*. at 689; *see also O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id*. at 695. It is petitioner's burden to establish the elements of his ineffective assistance of counsel claim. *See United States v. Pierce*, 63 F.3d 818, 833 (6th Cir. 1995) (petitioner bears the burden of establishing counsel's ineffectiveness); *Lewis v. Alexander*, 11 F.3d 1349, 1352 (6th Cir. 1993) (same).

As the Supreme Court has recently explained, *Strickland* establishes a high burden that is difficult to meet, made more so when the deference required by § 2254(d)(1) is applied to review a state court's application of *Strickland*:

> "Surmounting Strickland's high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. ----, ----, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689-690, 104 S.Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id*., at 689, 104 S.Ct. 2052; *see also Bell v. Cone*, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether

an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S.Ct. 2052.

Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.*, at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at ----, 129 S.Ct. at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ----, 129 S.Ct. at 1420 . Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

*Harrington v. Richter*, 131 S. Ct. 770, 788 (2011).

2.      *Trial Counsel*

a.  *Failure to Present Witnesses (Claim I)*

Petitioner contends that counsel was ineffective for failing to call five witnesses at trial: attorney Arnie Weiner and defendant's other cellmate, Claude Boling; Kathy Jenson, a neighbor of the victim; and petitioner's stepbrother and stepmother.  The Court should conclude that petitioner is not entitled to habeas on these claims.

"Complaints of uncalled witnesses are not favored in federal habeas review."  *Marler v. Blackburn*, 777 F.2d 1007, 1010 (5th Cir. 1985); *Aponte v. Scully*, 740 F. Supp. 153, 158 (E.D.N.Y. 1990).  As one court has explained:

The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial.  [Defendant] does not identify any witnesses that his counsel should have called who would have been helpful.  Defense counsel's conduct in this regard appears to fall within the wide range of reasonable professional representation.  Decisions whether to engage in cross examination, and if so to what extent and in what manner, are similarly strategic in nature.

*United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987); *accord Reese v. Fulcomer*, 946 F.2d

22

247, 257 (3d Cir. 1991) (counsel's performance not deficient where counsel did not call alibi witness whose testimony could have been damaging); *United States v. Porter*, 924 F.2d 395, 397 (1st Cir. 1991) (decision not to call witnesses who could have incriminated defendant within scope of informed professional judgment). Further, it is petitioner's burden to establish the elements of his ineffective assistance of counsel claim. *See United States v. Pierce*, 63 F.3d 818, 833 (6th Cir. 1995) (petitioner bears the burden of establishing counsel's ineffectiveness); *Lewis v. Alexander*, 11 F.3d 1349, 1352 (6th Cir. 1993) (same). Thus, "a petition for habeas corpus relief based on counsel's failure to call witnesses must present this evidence in the form of the actual testimony by the witness or affidavits." *United States ex rel. Townsend v. Young*, No. 01 C 0800, 2001 WL 910387, at *5 (N.D. Ill. Aug. 8, 2001) (citing *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991)); *see also*, *Harrison v. Quarterman*, 496 F.3d 419, 428 (5th Cir. 2007); *Dows v. Woods*, 211 F.3d 480, 486 (9th Cir. 2000). At the outset, petitioner has failed to provide any evidentiary support, by affidavit or otherwise, to substantiate his claims regarding the testimony that would have been offered by the missing witnesses, and he is therefore not entitled to habeas relief.

More specifically, it is clear from the record that the Michigan Court of Appeals reasonably concluded that counsel's failure to call these witnesses did not amount to ineffective assistance of counsel. Turning first to petitioner's stepbrother and stepmother, petitioner has failed to demonstrate that counsel performed deficiently by failing to call these witnesses, or that they could have offered exculpatory alibi testimony such that he was prejudiced by the failure to call them at trial. At trial, counsel informed the court that he had discussed with petitioner calling these two witnesses, and that petitioner had elected not to call them. *See* Trial Tr., Vol. V, at 47. In an affidavit attached to the prosecutor's response to petitioner's motion for new trial, counsel

23

elaborated that he had interviewed petitioner's stepbrother and stepmother and "determined that they could not account for Michael Crimes' whereabouts at the actual time of the offenses."  Answer to Mot. for New Trial, in *People v. Crimes*, No. 05-204052-FC (Oakland County, Mich., Cir. Ct.), Ex. A, Aff. of Richard Terrell Taylor, ¶ 4 [hereinafter "Taylor Aff."].  At the hearing on petitioner's motion for a new trial, petitioner's appellate counsel indicated that he had tried to contact the witnesses, but had only been able to contact petitioner's stepbrother, who "was not helpful."  Mot. Hr'g Tr., dated 2/28/07, at 4.  Counsel indicated that he therefore could not "make in good faith at this point the argument those alibi witnesses would have been useful."  *Id*.  Based on these submissions, the trial court concluded that "there was a reasonable basis for [counsel's] decision regarding which witnesses to call."  Opinion & Order Re: Def.'s Mot. for a New Trial, in *People v. Crimes*, No. 05-204052-FC (Oakland County, Mich., Cir. Ct.), at 4.  On appeal, the Michigan Court of Appeals determined that petitioner had waived the issue based on appellate counsel's assertion at the hearing on the motion for new trial, and that in any event petitioner could not establish his claim because he failed to submit an affidavit from either witness.  *See Crimes*, 2007 WL 4462377, at *1.  In light of petitioner's failure to provide any evidence from these witnesses suggesting that they would have testified favorably to petitioner at trial, trial counsel's affidavit averring that the witnesses could not provide an alibi, and appellate counsel's assertion that the purported alibi witnesses were not helpful, petitioner cannot show that counsel performed deficiently by failing to call these witnesses at trial or that he was prejudiced thereby.

Turning to Weiner and Boling, petitioner contends that these witnesses would have impeached Jermaine Jackson's testimony that petitioner admitted the crimes to him while they were incarcerated together.  Specifically, Weiner would have testified that he gave police reports about

the crime to Jackson to pass along to petitioner, thus suggesting that Jackson learned the details of the crime from these reports rather than from an admission made by petitioner. Boling, the other cell mate of Jackson and petitioner, would have testified that petitioner and Jackson never had a private conversation. Again, petitioner has failed to present any affidavit or other evidence corroborating that these witnesses would have so testified. And, in any event, the record establishes that counsel was not ineffective for failing to call these witnesses. In his post-trial affidavit, trial counsel averred both that petitioner "told him that he did have conversations in the jail with Mr. Jermaine Jackson," and that Jackson "was aware of details of the offenses which were not contained in the police reports." Taylor Aff., ¶¶ 5-6. Evidence at trial corroborated this latter assertion. As explained by the Michigan Court of Appeals, "police officers testified that until Jackson came forward, no one knew the identity of the second robber." *Crimes*, 2007 WL 4462377, at *2. Further, "it was Jackson who first disclosed the possible involvement of" two other people, and he "supplied an alleged 'hit list' written by defendant that listed [their] telephone numbers, which were not contained in the police reports or preliminary examination transcript." *Id.* As the court of appeals reasonably determined, "[i]n light of this evidence, Weiner's testimony would have done little to impeach Jackson's credibility." Likewise, in addition to petitioner's admission that he had private conversations with Jackson, the court of appeals reasonably concluded that "trial counsel reasonably should have expected that the jury would have difficulty believing that Boling could possibly account for [petitioner's] and Jackson's presence at all times," particularly in light of the information Jackson was able to provide that was not contained in the police reports. *Id.*

Finally, petitioner cannot show that counsel was ineffective for failing to call Jensen. According to petitioner, Jensen would have testified that she saw only one man leaving the victim's

apartment, contradicting the victim's testimony that there were two robbers.  However, as the court

of appeals explained, Jensen's police statement showed that she "could not see the door of the

victim's second floor apartment," and the victim testified that petitioner and the second robber left

the apartment at separate times.  *Id.*  Thus, Jensen's testimony would have done little, if anything,

"to impeach the victim's testimony that there were two robbers."  *Id.*  Further, counsel could have

reasonably concluded that calling Jensen would have done more harm than good, in light of the fact

that petitioner "fit the description of the man that Jensen saw."  *Id.*

In short, petitioner has failed to provide any affidavit or other evidence indicating what the

missing witnesses would have testified to if they had been called at trial, and the record demonstrates

that counsel had reasonable bases for refusing to call the witnesses.  Thus, the Michigan Court of

Appeals's resolution of this ineffective assistance claim was a reasonable application of *Strickland*,

and petitioner is therefore not entitled to habeas relief.

### b.  Failure to Object to Sufficiency of the Evidence (Claim IV)

Petitioner next contends that trial counsel was ineffective for failing to object to the

sufficiency of the evidence at trial.  Presumably, petitioner is arguing that counsel should have filed

a motion for a directed verdict at the conclusion of the evidence.  The Court should conclude that

petitioner is not entitled to habeas relief on this claim.

To show that he was prejudiced by counsel's failure to move for a directed verdict, petitioner

must show that the evidence adduced at trial was constitutionally insufficient to sustain his

conviction.  *See Hurley v. United States*, 10 Fed. Appx. 257, 261 (6th Cir. 2001); *Maupin v. Smith*,

785 F.2d 135, 140 (6th Cir. 1986); *Burston v. Caldwell*, 506 F.2d 24, 28 (5th Cir. 1975).  In

reviewing the sufficiency of the evidence, "the relevant question is whether, after viewing the

26

evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution, *see Neal v. Morris*, 972 F.2d 675, 678 (6th Cir. 1992), and must give circumstantial evidence the same weight as direct evidence. *See United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993).

Here, there was more than sufficient evidence to sustain petitioner's conviction. The victim testified that petitioner, whom she knew and identified at trial, broke into her apartment and robbed her at gunpoint. This evidence alone, if believed by the jury, was sufficient to support petitioner's conviction. *See United States v. Kenyon*, 397 F.3d 1071, 1076 (8th Cir. 2005) ("Even in the face of inconsistent evidence, a victim's testimony alone can be sufficient to support a guilty verdict."); *United States v. Mejia*, 909 F.2d 242, 245 (7th Cir. 1990); *Holderfield v. Jones*, 903 F. Supp. 1011, 1017 (E.D. La. 1995). It is well-established that a reviewing court, whether on direct appeal or habeas review, "do[es] not make credibility determinations in evaluating the sufficiency of the evidence." *United States v. Owusu*, 199 F.3d 329, 344 (6th Cir. 2000); *Walker v. Russell*, 57 F.2d 472, 475-76 (6th Cir. 1995); *see also*, *United States v. Bailey*, 444 U.S. 394, 414-15 (1980) ("It is for [jurors] and not for appellate courts to say that a particular witness spoke the truth or fabricated a cock-and-bull story."). "The fact that the testimony is contradictory does not mean that evidence is insufficient, only that the jury must make credibility determinations." *Government of the Virgin Islands v. Isaac*, 50 F.3d 1175, 1179 (3d Cir. 1995). It is the job of the jury, not this Court sitting on habeas review, to resolve conflicts in the evidence, and this Court must presume that the jury resolved those conflicts in favor of the prosecution. *See Jackson*, 443 U.S. at 326; *United States*

*v. Sherwood*, 98 F.3d 402, 408 (9th Cir. 1996).   Here, the victim's testimony, if believed, established the necessary elements of the offenses charged against petitioner.   Whether to believe the victim was for the jury, not for the Michigan Court of Appeals or for this Court on habeas review.   Further, the victim's testimony was corroborated by the testimony of Jermaine Jackson that petitioner had confessed the crimes to him.   Again, in reviewing the sufficiency of the evidence, the Court must presume that the jury resolved any credibility issues in favor of Jackson's testimony.

Because the evidence presented at trial was sufficient, petitioner cannot show that he was prejudiced by counsel's failure to file a motion for a directed verdict.   Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### c. Conflict of Interest (Claim V)

Petitioner next claims that he was denied his right to counsel because counsel was operating under a conflict of interest.   The Court should conclude that petitioner is not entitled to habeas relief on this claim.

An "actual conflict of interest results if the defense attorney was required to make a choice advancing his own interests to the detriment of his client's interests." *Stoia v. United States*, 22 F.3d 766, 770 (7th Cir. 1994) (internal quotation omitted); *accord Bonin v. Calderon*, 59 F.3d 815, 827 (9th Cir. 1995).   In order to show such a conflict, petitioner must "'point to specific instances in the record to suggest an actual conflict or impairment of [his] interests.'"  *United States v. Hall*, 200 F.3d 962, 965-66 (6th Cir. 2000) (quoting *Thomas v. Foltz*, 818 F.2d 476, 481 (6th Cir. 1987) (internal quotation omitted)); *accord Riggs v. United States*, 209 F.3d 828, 831-32 (6th Cir. 2000). An "adverse effect" is established where the defendant points to "some plausible alternative defense

28

strategy or tactic [that] could have been pursued, but was not because of the actual conflict impairing counsel's performance." *Perillo*, 205 F.3d at 781 (internal quotation omitted); *accord Stoia*, 22 F.3d at 771 (quoting *Wilson v. Mintzes*, 761 F.2d 275, 286 (6th Cir. 1985)).

Here, on the date originally scheduled for trial, petitioner's then-counsel informed the court that an incident had occurred between he and Jackson at the Oakland County Jail over the previous weekend, in which he had called Jackson a "snitch" in front of other detainees. As a result, the Oakland County Sheriff conducted a criminal examination and revoked counsel's privileges to visit detainees in the jail. Although the prosecutor represented to the trial court that the investigation had been completed and no criminal charges were contemplated, counsel indicated that he was hampered in his ability to defend petitioner because he could not visit at the jail. Further, after hearing testimony from Jackson regarding the incident, the court concluded that Jackson's account differed from that of petitioner's counsel. Because of this, a situation could arise whereby counsel would be a necessary witness at trial. Based on these factors, the trial court appointed substitute counsel and adjourned the trial. Petitioner contends that because his counsel was facing potential criminal charges by the same prosecutor, counsel was laboring under a conflict of interest which adversely affected his representation.

It is likely that the pending criminal charges against petitioner's first counsel gave rise to a conflict of interest. *See, e.g.*, *United States v. Levy*, 25 F.3d 146, 156 (2d Cir. 1994). This fact, however, does not entitled petitioner to habeas relief because the trial court immediately cured the problem. The immediate appointment of substitute counsel cured any adverse affect arising from counsel's conflict. *See United States v. Hernandez*, 333 F.3d 1168, 1175 (10th Cir. 2003); *United States v. Luciano*, 158 F.3d 655, 661 (2d Cir. 1998); *cf. Norris v. Schotten*, 146 F.3d 314, 331-32

29

(6th Cir. 1998).  Except for the very brief period between initial counsel's conduct at the jail during the weekend, at which time the conflict arose, and his withdrawal the following Monday, petitioner was at all times provided "representation that [was] free of any actual conflict of interest with counsel."  *United States v. Ziegenhagen*, 890 F.2d 937, 939 (7th Cir. 1989).  Petitioner does not point to, nor does the record reveal, anything of substance that happened during the one or two days in which counsel was laboring under a conflict of interest that adversely affected any aspect of petitioner's defense.

Further, although petitioner does not expressly make such an argument I note that petitioner cannot claim that the withdrawal of his counsel based on the conflict of interest violated his Sixth Amendment right to counsel of his choice.  The Sixth Amendment provides, in relevant part, that "[i]n all criminal prosecutions the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense."  U.S. CONST. amend. VI.  This right contemplates a corollary right to the counsel of one's choice.  As the Supreme Court has explained, "'the Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds.'"  *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006) (quoting *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624-25 (1989)).  Thus a criminal defendant who has the desire and the financial means to retain his own counsel generally "'should be afforded a fair opportunity to secure counsel of his choice.'" *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1351 (6th Cir. 1993) (quoting *Powell v. Alabama*, 287 U.S. 45, 53 (1932)).  This right, however, is not absolute, and "is circumscribed in several important respects."  *Wheat v. United States*, 486 U.S. 153, 159 (1988); *see also*, *Gonzalez-Lopez*, 548 U.S. at 144.  Two of those limitations are applicable here.

30

First, "the right to counsel of choice does not extend to defendants who require counsel to be appointed for them." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 151 (2006). Because petitioner required the appointment of counsel, he had no right to the counsel of his choice. Second, a trial court retains "wide latitude in balancing the right to counsel of choice against the needs of fairness," and has "an 'independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.'" *Gonzalez-Lopez*, 548 U.S. at 152 (quoting *Wheat v. United States*, 486 U.S. 153, 160 (1988)). Thus, where counsel is laboring under an actual conflict of interest the court may disqualify counsel, even where counsel is retained or where the defendant waives the conflict of interest. *See Wheat*, 486 U.S. at 162-63; *United States v. Puryear*, 719 F. Supp. 2d 571, 573-74 (W.D. Pa. 2010).

With the exception of a one or two day window in which nothing of substance in petitioner's case occurred, petitioner was represented by an attorney who was representing no interest in conflict with a vigorous defense of petitioner. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

3.      *Appellate Counsel (Claim VII)*

Finally, petitioner contends that his appellate counsel was ineffective for failing to raise his motion for relief from judgment claims on direct appeal. To establish prejudice in the appellate counsel context, petitioner must show a reasonable probability that his claims would have succeeded on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *McCleese v. United States*, 75 F.3d 1174, 1180 (7th Cir. 1996). As explained above, each of petitioner's claims is without merit, and thus petitioner cannot make this showing. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

31

H.      *Recommendation Regarding Certificate of Appealability*

1.      *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability.  *See* 28 U.S.C. § 2253(c)(1).  The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000).  Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue.  Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84.  Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable."  *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

32

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254. The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue." FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id.*, advisory committee note, 2009 amendments. In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

2.    *Analysis*

If the Court accepts my recommendation regarding the merits of petitioner's claims, the Court should also deny petitioner a certificate of appealability, for the reasons explained above. It is clear that petitioner's sentencing guidelines claim is not cognizable on habeas review, and that *Blakely* does not apply to Michigan's indeterminate sentencing scheme. Thus, the resolution of petitioner's sentencing claims is not reasonably debatable. Likewise, the jury instructions given by the court comported with Michigan law, were supported by the evidence, and did not coerce the jury to return a verdict, and thus the resolution of petitioner's instructional error claim is not reasonably debatable. With respect to petitioner's ineffective assistance of counsel claims, petitioner has failed to provide any support for his claim that various witnesses would have testified in his favor, and the record establishes either that counsel had good reason not to call the witnesses or that they would

33

not have provided materially favorable testimony. Further, the record clearly establishes that the prosecution presented sufficient evidence, and that the trial court immediately remedied any conflict of interest which developed by substituting new counsel. Thus, the resolution of petitioner's ineffective assistance of trial counsel claims is not reasonably debatable. Finally, because the resolution of petitioner's underlying claims is not reasonably debatable, the resolution of petitioner's derivative ineffective assistance of appellate counsel claim likewise is not reasonably debatable. Accordingly, the Court should deny petitioner a certificate of appealability.

I.    *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus. If the Court accepts this recommendation, the Court should also deny petitioner a certificate of appealability.

III.    NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local*

34

*231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Paul J. Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: 6/14/11

---

The undersigned certifies that a copy of the foregoing
order was served on the attorneys of record and  by
electronic means or U.S. Mail on June 14,  2011.

s/Eddrey Butts
Case Manager

---

35